[Civ. No. 15037. Second Dist., Div. One. Apr. 8, 1946.]

C. DON HARMS, Appellant, v. CLAUDE C. REED et al.,
Respondents.

Mark S. Feiler and Wood, Crump, Rogers & Arndt for Appellant.

Marcus, Rabwin & Nash for Respondents.

WHITE, J.—Plaintiff herein brought an action against his wife, Hortense R. Harms, and his wife's parents, Mr. and Mrs. Reed, seeking to quiet title to certain real property and for declaratory relief. From a judgment adverse to him he prosecutes this appeal.

By the first cause of action of his amended complaint plaintiff alleged that he and his wife were the owners of three described parcels of land in the county of Los Angeles; that the defendants Mr. and Mrs. Reed claimed an interest therein and that such interest was without right; that the interest of plaintiff's wife therein was a community interest only and that she was joined as a defendant because she had refused to join as a plaintiff. By his second cause of action plaintiff alleged that between January 11, 1936, and November 11, 1941, he and his wife borrowed money from the defendants Reed aggregating $6,200 for use by plaintiff in his real estate business and in the purchase and sale of real property in Los Angeles and elsewhere; that such loans were secured by a mortgage executed by Mr. and Mrs. Harms in December, 1938, in the sum of $5,000, on property known as 6405 Bryn Mawr Drive, Los Angeles. It was further alleged that to facilitate the purchase by plaintiff of Parcel No. 1, he caused title thereto to be taken in the name of Mrs. Reed and title to Parcel No. 2 to be taken in his wife's maiden name, Hortense Reed, but that both parcels were to be held in trust for plaintiff and his wife; that in November, 1941, defendants Reed loaned to Mr. and Mrs. Harms $1,700 for the purchase of Parcel No. 3, title to which was taken in the names of Mr. and Mrs. Reed and Mrs. Harms to secure the defendants Reed for the moneys so advanced; that a total of $6,200 was loaned by the Reeds, of which $2,820 was repaid, leaving unpaid a balance of $3,380, plus interest. It was further alleged that until June 1, 1944, plaintiff had exclusive possession of the three parcels, collecting rents, making repairs and defraying all expenses for upkeep, taxes, interest and mortgage installments when required, without the Reeds contributing any part; that his wife had instituted a suit for divorce and by reason thereof a controversy had arisen between the parties, the defendants contending that plaintiff held only a one-fourth interest in Parcels Nos. 1 and 2 and had no interest whatever in Parcel No. 3.

By their answer defendants alleged that Mr. and Mrs.

Reed owned one-half interest in Parcels 1 and 2; that the defendant Mrs. Harms owned a one-fourth interest as her separate property and that the remaining one-fourth was held by plaintiff and his wife as community property; that the defendants Reed owned Parcel 3 in its entirety. The defendants denied that they made loans to plaintiff and alleged that the moneys forwarded to him were for the purpose of making purchases of real estate for and on behalf of the defendants, and that in consideration of his services in that regard it was agreed that plaintiff should have a one-fourth interest in Parcels 1 and 2; that it was further agreed that plaintiff should make no charge for his personal services rendered in the repair and maintenance of Parcels 1 and 2, nor for his services as a broker, the consideration for such services being the transfer to him of a one-fourth interest in Parcels 1 and 2. As to the mortgage on the Bryn Mawr Drive property, defendants alleged that it was not made for the purpose of securing the moneys above referred to, but "that in addition to the monies given to the plaintiff by these defendants for the purchase of properties for the defendants as hereinabove alleged, the defendants did make certain cash loans to the plaintiff and to the defendant Hortense R. Harms, and said loans were secured by the mortgage on the Bryn Mawr property"; that said mortgage exceeded the actual amount loaned and that defendants claimed under the mortgage only the amount that would be shown by an accounting to be due them for loans made. The defendants further asserted that title to Parcel 3 was taken in the names of all four parties in order to satisfy certain FHA financing requirements, but that it was agreed that plaintiff and his wife had no interest therein.

After trial without a jury, the court made findings of fact and conclusions of law as follows:

That the parties had orally agreed that the Reeds would furnish money for the purchase of income property, plaintiff to contribute his services in the purchase, upkeep and maintenance thereof, and that each of the four parties was to own a one-fourth interest therein "as separate property respectively"; that Parcels 1 and 2 were so purchased, title to Parcel 1 being taken in the name of Mrs. Reed and title to Parcel 2 by Mrs. Harms in her maiden name; that plaintiff maintained and managed said properties from the time of

their purchase to June 1, 1944, and his wife had collected the rents thereof since that date; that "an accounting shall be rendered by the plaintiff and the defendants as to the financial transactions handled by each of said parties affecting the properties involved in this action, the respective interests of each party to be charged or credited with the sums said accounting will show to be due to or from each of said parties."

The court further found (finding numbered XII) "that the plaintiff is to continue to contribute his services in the maintenance, operation and management of said properties inasmuch as in the agreement hereinabove referred to between the plaintiff and the defendants the plaintiff was to contribute his services in maintaining, operating and managing the properties, and also his services as a broker in the purchase thereof as consideration for the transfer to him of a one-fourth interest in said properties as his separate property."

As to Parcel No. 3, the court found that it was purchased with funds advanced specifically for that purpose by defendants Reed, said parcel to be the sole property of defendants Reed; that plaintiff was to contribute his personal services in the maintenance, operation and repair of Parcel 3 and was to make no charge for his brokerage services in the purchase of said property.

The court further found "that plaintiff had the exclusive possession, management and direction of the properties referred to hereinabove from the time of their purchase to June 1, 1944, but it is not true that he made all the repairs, defrayed all the expenses, paid all the taxes, insurance and interest and mortgage installments and it is not true that the defendants, Claude C. Reed and Eva Reed, contributed no part thereof, and as to the amount of any personal funds used and applied by the plaintiff in and to the maintenance, repair and upkeep of said properties, said amount should be determined by an accounting. . . ."

By its judgment the court decreed that each defendant had an undivided one-fourth interest in Parcels 1 and 2; that Parcel 3 was owned by the defendants Reed, and that "an accounting shall be rendered by the plaintiff and the defendants setting forth all their dealings with reference to the properties . . . and in said accounting the plaintiff, Don Harms, shall make no charge for his personal services ren-

dered in maintaining, operating and repairing the properties, and he shall make no charge for any services rendered as a broker in acquiring said properties.''

Appellant does not urge that the judgment should be reversed in toto. In his brief he states: ''We recognize that there is evidence in the record which supports the judgment in so far as the court has determined who are the owners of the respective properties. Nor, as we see it, is it necessary to remand the case for further proceedings, but we respectfully urge that the judgment should be modified by eliminating Parcel No. 3 from the fifth paragraph of the judgment, . . .'' That part of the judgment to which appellant objects provides that in rendering an accounting the plaintiff ''shall make no charge for his personal services rendered in maintaining, operating and repairing the properties, and he shall make no charge for any services rendered as a broker in acquiring said properties.'' Appellant's contention is that the judgment should be modified to provide that he ''shall make no charge for his personal services rendered in maintaining, operating and repairing the properties described in paragraphs I and II hereof (parcels Nos. 1 and 2), and he shall make no charge for any services rendered as a broker in acquiring any of the properties described herein.''

Appellant urges further that the foregoing finding numbered XII, so far as it obliges him ''to continue to contribute his services in the maintenance, operation and management of said properties,'' should be eliminated.

Appellant first urges that the court erred in adjudging that in the accounting among the parties the plaintiff should make no charge for his personal services in maintaining or operating Parcel No. 3 (in which parcel the court found he had no interest), and that the finding upon which this portion of the judgment is based, is not supported by the evidence. Appellant contends that while it appears he was to make no charge for services on Parcels 1 and 2 because he was to receive a one-fourth interest in these parcels, no such agreement on his part is shown as to Parcel No. 3. In connection with this parcel Mrs. Harms testified as follows:

''Q. Was anything said about Mr. Harms being compensated for his services in connection with 2008? A. No; he said, 'Hortense, in order to make amends, I will do whatever is necessary in the negotiation of the purchase of that prop-

erty.' . . . He said, 'Hortense, write your folks and say that we have found the ideal spot. . . .'

"Q.   Did he (plaintiff) ever tell you he was going to make a charge for his work?   A.   No, as a matter of fact, he said he wasn't going to make a charge for his work.   He said, *'I am going to do the work'*—this was at the time, you see,—he said, *'I am going to do the work on this to compensate for how I acted when your folks were out here last time.'*  (Emphasis added.)

"THE COURT:   What was the extent of the work that he did on the property?   A.   Personally?

"THE COURT:  "Yes.   A.   He helped with a termite job that was necessary to qualify for the FHA loan.   He directed the work of three other boys, and me.

"THE COURT:   Is that all?   A.   Also he rented the property and collected the rents.

"THE COURT:   No, I meant actual work.   A.   Oh, actual work?

"THE COURT:   Yes.   A.   He has done some minor repairs. I remember a sewer job.   He fixed the sink.   I distinctly remember the sewer job and the sink stopping up, and restoring some draperies in the living room, cleaning and redecorating in the small studio apartment.   Well, there was cleaning in the larger studio—in the main house, too.''

The defendant Mr. Reed testified as follows:

"Q.   Well, what was Mr. Harms to receive for the work that he was doing in 2008? . . . I don't know.   There was no agreement with us in regard to any information on anything like that. . . .

"Q.   Did he ever tell you—that is, Mr. Harms—that he would do it without any pay for his services? . . . A. No, sir.''

Appellant's contention is that the conversation between Mr. Harms and his wife did not constitute an agreement, neither of the defendants Reed being present, and that "it is incredible that if Mr. Harms had intended to bind himself not to make any charge for his personal services in the maintenance and operation, and particularly any repairs, that he would not have told his wife to so advise her parents, or if he did not do that, that she would not have so advised them instead of merely writing them that she and her husband would look after the property for them.''   This contention cannot be sustained.   In the case at bar the trial court

was called upon to determine the terms of an oral agreement entered into in 1936 and carried out and acted upon by the parties over a period of years. The testimony of Mrs. Harms above quoted was not contradicted. Concerning the purchase of Parcel No. 3, plaintiff testified that although he did not ask his wife to write to her parents, he knew that she did. Opposed to this was the testimony of Mrs. Harms that her husband *instructed* her to "write to the folks" with reference to every transaction which took place. It appears that all communication between the Harms and the Reeds was carried out through letters written by Mrs. Harms to her parents. While the statements attributed to plaintiff were not communicated directly by him to the Reeds, nevertheless they constituted evidence which the trial court was entitled to consider, along with all the other evidence in the case, in determining what his agreement actually was. Plaintiff specifically told Mrs. Harms that he would not make any charge as to Parcel No. 3, whereupon she wrote her parents the letter (Exhibit 3), which the court interpreted as being to that effect. In such circumstances, this court cannot disturb the finding of the trial court. ■ The power of a reviewing court is limited to a determination of whether there is any substantial evidence, contradicted or uncontradicted, which will support the judgment rendered, and an appellate court cannot substitute other inferences for those drawn by the trial court upon conflicting evidence. (*Poe* v. *Lawrence*, 60 Cal. App.2d 125 [140 P.2d 136].) ■ Where the facts established are such as reasonably to permit opposing inferences to be drawn therefrom, and the trial court has adopted one and rejected the other, an appellate court will not disturb the findings. (*Baylis* v. *Baylis*, 48 Cal.App.2d 674 [120 P.2d 89].)

■ The trial court chose to believe the testimony of Mrs. Harms as to what her plaintiff husband said to her, whereas in connection with the verity of the latter, the trial judge stated he "was quite unfavorably impressed with his reliability as a witness." The trial court characterized the testimony of Mrs. Harms as "for the most part, . . . the type you could rely upon, from the manner in which she testified." In evaluating the testimony given by defendants Mr. and Mrs. Reed, the court said that they "tell a perfectly straightforward story, and they, all three of the defendants, are corroborated by all the other witnesses that testified, and appa-

rently truthfully, . . . all their testimony corroborates the testimony of the defendants and their contentions as to how these properties were to be held." The record presents a situation where an appellate tribunal, under long established and recognized rules, is without power to substitute its judgment for that of the trier of facts.

Appellant asserts that the following portion of the court's findings is indefinite, uncertain and not supported by the evidence; "That the plaintiff is to continue to contribute his services in the maintenance, operation and management of said properties (parcels Nos. 1 and 2) inasmuch as in the agreement hereinabove referred to between the plaintiff and the defendants the plaintiff was to contribute his services in maintaining, operating and managing the properties . . . as consideration for the transfer to him of a one-fourth interest in said properties. . . ."

As heretofore pointed out, the basis for the judgment determining the ownership of the respective properties was the oral agreement entered into between the parties in 1936. With reference to the conversation out of which the agreement arose, defendant Mr. Reed testified in part as follows: "I said, 'Well, if it is a good buy, which you say it is, you can do this work, as you say, and I will furnish the money to put up the payments with and for the work—to buy the materials—and we will then divide it up between the four of us.' That meant Harms, Mrs. Harms, my wife and myself, each of us owning one-fourth." In the same regard, defendant Mrs. Harms testified:

"A. After father and Don came back down onto the ground, after they had been in the building, Don again said he had no money with which to purchase the property or make deals; and he said if father would put up the money to purchase these properties, he would condition them and take care of them. And father said, 'I will furnish the money; you will do the work'—he said it to Don; 'and the properties will belong to Eva, Hortense, myself and Don.'

"Q. What did Mr. Harms say to that?

"A. All right."

Appellant asserts that the court's finding that he must continue to contribute his services in the maintenance and operation of Parcels Nos. 1 and 2 contravenes subdivisions 2 and 6 of section 3390 of the Civil Code. Subdivision 2 pro-

vides that "An obligation to employ another in personal service" cannot be specifically enforced. The contract here under consideration was not one of employment. It was a joint enterprise wherein it was specifically agreed that defendants Reed were to furnish the necessary money and appellant was to do the work, contributing his services in the purchase of the properties and in their upkeep, maintenance and repair. The court found, and the evidence supports the finding, that in consideration of his performing the aforesaid services in connection with the purchase and upkeep of the property, he was to and did receive a one-fourth interest in Parcels Nos. 1 and 2 under the agreement.

█ In urging that the court's finding violates subdivision 6 of section 3390 of the Civil Code, appellant claims that the finding is uncertain as to the length of time he will be required to continue the contribution of his services. In that regard appellant asks, "Must he continue until the properties are sold? Or, if they are not sold, must he continue to do so as long as he lives? And just what must he do towards maintaining the properties?" Subdivision 6 of the cited section provides that an obligation cannot be specifically enforced when its terms "are not sufficiently certain to make the precise act which is to be done clearly ascertainable." In the instant case there was testimony that Parcels 1 and 2 were purchased as an investment and for resale. Clearly, under the agreement, appellant was obliged to continue to contribute his services for the upkeep and maintenance of the property, as well as the collection of rents therefrom, until the purpose of the agreement—resale of the properties—was accomplished. The fact that at the time this litigation was initiated the properties had not been sold does not and cannot vary, alter or impair the terms of the original agreement under which the joint enterprise was established.

█ In answer to appellant's query as to what was meant by "maintain," it might be noted that defendant Mrs. Reed testified that appellant himself stated with reference to Parcels 1 and 2 that "he would purchase the properties and he would *maintain*, them, collect the rents, . . . and in that way he would earn his one-fourth." (Emphasis added.) There was also testimony that in maintaining the property it was not intended that he pay for materials or labor, and that such charges were to be deducted from the rents collected by him. To us it seems clear that the parties clearly understood what was meant and intended by the word "maintain."

In view of the fact that, as conceded by appellant, "the evidence does not explain why plaintiff ceased to maintain, manage, or operate the properties after June 1, 1944, nor whether he did so willingly or not," the trial court was not called upon to give, nor are we warranted in giving, consideration to that phase of the differences which have arisen between the parties herein.

For the foregoing reasons, the judgment is affirmed.

York, P. J., and Doran, J., concurred.